Our next case for argument is Southern Utah Wilderness v. Burke. Thank you, Your Honors. May it please the Court, I'm David Halverson, representing the State of Utah and six of the counties in this case. Rather than attempting to split time, I'd like to save four or five minutes, which will be handled by my co-appellant. This case involves a settlement between BLM and certain special interest groups regarding management of millions of acres of federal public land in Utah. After eight years of litigating the case and only resolving one out of six challenged RMP's resource management plans, it was understandable that BLM was ready to settle. Unfortunately, their fatigue won out over good sense, and the settlement they agreed to is against public policy and is also unlawful. This morning, I'd like to focus on one key reason why that's the case and also discuss why the state has standing to assert this challenge. If tomorrow the Trump administration decided it wanted to change its policies and guidelines regarding public land management, it could do so and it could apply those changes in 49 states, but not Utah. That is because this settlement agreement gives the special interest groups special veto power over any changes in policy or in regulations, which are somehow viewed as inconsistent with the guidelines. Is that what the agreement says? In paragraph 15 of the agreement, which is on the record in page 1102. Yes, the very end of that paragraph. We are looking at the same language, I think. Go ahead. So at the beginning of that paragraph, it requires that travel management plans be conducted pursuant to statutes, regulations, and certain instructional memoranda. Statutes and regulations, of course, are binding, but instructional memoranda are not. They're discretionary. And yet this settlement requires that they be done according to that. And then if anything wants to change, they must go through the provisions. Read the rest of the paragraph, the last sentences in the paragraph. After there is the listing of all the things you pointed to, it says nothing in the settlement agreement makes binding the aforementioned guidance. It does say that. But those two statements can't be read in concert. You cannot both say you have to follow the guidance and the guidance is discretionary. One of those provisions has to be read out. And I think as you continue in the paragraph, and especially as you look at the response briefing of the appellees, it makes clear that their position is that if any changes in guidance occur, they can be applied outside of the travel management areas. They can be applied here if they are consistent. But if they are viewed as inconsistent, then they will not apply unless you go through paragraph 12. Paragraph 12 requires any changes to be in writing and to be agreed upon by the public. But all of that precedes the disclaimer that's at the end of paragraph 15 that says all of this is nice and interesting, but it doesn't really matter. I agree. But again, those two cannot be read in concert. It's not binding. It's not limiting. It's the parties may agree to modify the settlement agreement. They may agree. This is a very spongy settlement agreement. I'm not really certain what it really does because of this disclaimer. The disclaimers are there, but I think the language that say that the conditional language that they may modify, I think the clarity really comes through the response briefing of both the agency and the special interest groups, in which they clearly say that if any changes are inconsistent, that they may apply, that they may be approved, that the settlement agreement may be modified. There's no allowance for the executive branch to change its mind and automatically have that applied in Utah. That only will be applied in Utah if the settlement agreement is modified. And that's all done outside of the context of the APA, which requires that any binding rules be gone through a public notice and comment process. You're saying if the law and regulations change, they cannot be applied in Utah. If they are inconsistent, then I believe the affilies are clear that they will consider modifying the settlement agreement. If guidelines change and they are inconsistent, then the special interest groups are the gatekeepers. I think that I understand the disclaimers are there, but they cannot be read both to say you must do this and, oh, by the way, you don't really need to do that. Has this happened at all yet? The travel management agreements are, yes, currently being implemented. They are ongoing in Utah, and so we haven't come to final decisions, but the state is currently involved in the process working together with the agency to conduct these travel management plans. Well, under your argument, has any of them been vetoed yet? I'm not sure I understand the question. Well, what I'm asking you, you're arguing that they have under this provision, which you're arguing that the SUA has the authority at any time if they don't agree, they don't have to sign off on it, which you're arguing that gives them a veto power. Over new regulations? There haven't been new policies or regulations. So it hasn't anything happened yet in regards to that? They have not had the opportunity to exercise their veto power, yes. Okay. Can you, off the top of your head, give me an example of how that might occur? Sure. If, for example, some of the specific guidance that is cited in paragraph 15, one of those is BLM Utah Instructional Memoranda 2012-66. If BLM Utah or if the federal BLM decided that it wanted to change that guidance, change, update it, guidance is supposed to be temporary, so that would be an entirely reasonable thing to do, if it were viewed as inconsistent, then it would not apply here unless they got permission. I'd also like to discuss standing. The case that we have here is a special circumstance in which a state as a sovereign is particularly interested and has legal rights and interests involved in the management of public lands within its borders. This court in the Johnson v. Lodge 93 case cited in our briefs recognized that a non-consenting intervener has the right to block a settlement if its legal rights or interests are implicated by the settlement. And I think I'd like to briefly discuss three points in which that occurs through the settlement agreement. This is not the case where a regulated entity who receives some decision, final agency decision by an agency, only have those rights or interests implicated at the end, when that decision is made. The state as a sovereign has special rights to be involved not only in the final decision, but in the process leading up to that decision, and there's three ways in which that occurs. First, BLM regulations and the settlement agreement itself in paragraph 16A, and that's on page 1102 of the record, states that state and local counties will be invited to be cooperating agencies. This gives them a right to be involved in the planning process. Again, it's an integral relationship between state and federal agencies. FLPMA section 202c9 also requires that when the state, or excuse me, when the federal government makes plans or managements, that they must coordinate those plans with the state. The governor is entitled to a consistency review, whereby the agency has to identify any inconsistencies, and the two work together to resolve that. Finally, in our brief, I'll just touch briefly as we discuss more in our brief, the role of the State Historic Preservation Act, or State Historic Preservation Officer, the SHPO, to comply with the National Historic Preservation Act. This court in the Pueblo of Sandia case recognized the relationship between federal and state SHPO is an integral part of complying with section 106 of the NHPA. So as a coordinating agency, as a cooperator, as an integral part of the SHPO process, the state has rights not only to be involved at the end of the day, but to be involved in the decision-making process itself. And the settlement agreement fundamentally alters that. If I could just make one last point, and then I'll save the remainder of my time. FLPMA, the multiple use mandate under FLPMA is a balancing act among competing but equal interests. For any management of public land, BLM should sit down and look at the options available to it. The highest use of a piece of public land may be grazing, it may be recreation, it may be mineral leasing, but this is a choice among equal options, all recognized as valuable by Congress. The settlement fundamentally alters that paradigm. Instead of deciding among equal options, it's saying, first, look at wilderness. Always look at wilderness, regardless of the parcel you're looking at. Wilderness becomes the first among equals. You always have to consider wilderness, you always have to be wary of any options that might impair wilderness. I believe it's against... Has anything happened that has impaired the state's interests as yet? The state is currently involved in that process. We believe the process itself is illegal. It increases exponentially the burdens on the state. It forces us to... As regards the historical folks, that side of it? That's part of it. Don't they want to be involved? I mean, isn't that their job? I think it's our duty. It's our duty as we protect the... Right. So how is that a harm or an injury? The involvement itself is not the harm, it's not the injury. It's increasing the burden to be involved, and it's forcing us to be involved in a process which is illegal and against public policy. Well, it might increase the burden, but you have the authority to exercise to be involved, don't you? I mean, that's what you're supposed to pay attention to in regards to that. If it needs your input, you give your input, and you have the right to do that. Correct. So how have you been burdened, other than say, well, I have to look at it a little more closely? It's not just look at it more closely, but it's look at it in ways that are illegal and against public policy. Valid existing rights is one example of that, to say you have to show a purpose and need for all valid existing rights. And so it's not just you need to be involved, but you have to go through hoops which are illegal and against public policy. And that's as going back to, again, focusing on wilderness, I believe it's against public policy for any special interest to get preferential treatment of their unique interests. I need for you, for me to clearly understand what's going on here, and I'm kind of like where Judge Briscoe is in reading this settlement agreement, but I've got a couple of questions that you need to either clarify for me or make it where I understand. But can you point to an exact place in the settlement agreement that contains new substantive rules that could only be promulgated through an APA notice and comment process? I want, in that agreement, that you can point to me to a place. I think, as we've already discussed under Paragraph 15, requiring saying you must conduct travel management pursuant to instructional memoranda, that itself cannot be done except through an APA public notice process. Now, is your whole argument then predicated on Paragraph 15? No, I think Paragraph 17E is also problematic, to say that you have to consider wilderness characteristics. Problematic is a different thing than your argument that the APA notice that the settlement agreement requires a rulemaking process which the settlement agreement bypasses. I think that's only one of our arguments, and I think the question is. Well, I'm asking you because one of your arguments might not be sufficient for me. Where else can you point to in there that this is going to be a rulemaking process and that it involves the APA? I think Paragraph 15 is the core of our rulemaking process, but I think that is not the only fatal flaw within the settlement agreement. With that, I'll save the remainder of my time. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Techley Hanson-Young, and I represent the Bureau of Land Management. With me is Robin Cooley, who represents the environmental groups, and Paul Turk, who represents the recreational vehicle user groups. Ms. Cooley plans to speak for five minutes, and Mr. Turk is available, should the panel have any questions for him. Well, Counsel, the reservation, you know, is subject to the questions that we may have, and to go right to the point of the ripeness, how is this case unripe when it's currently being implemented? This case is unripe because the state and county's challenges to the settlement agreement concern exclusively the interpretation of the settlement agreement itself and how BLM will implement it. But the argument is that it's not ripe because the argument is that it is ripe because you're already implementing this agreement. As of today, and even through the end of 2019, BLM will have made no final agency decisions that will have actually implemented the settlement agreement. But you're implementing it. In other words, the agreement is moving forward, and that's what they're attacking. So if it's not ripe, it can't be attacked yet, but you're implementing it, moving toward a final product to come out. So in and of itself, it would be ripe then before us, correct? Respectfully, Your Honor, I disagree, and that's because of the nature of the challenges that the state and the counties bring. So if the state and the counties simply had said, the fact that you're implementing the settlement agreement is what we challenge in and of itself, and perhaps it identified some other flaws with the settlement agreement, I hesitate to speculate on what those might be. But what the state and the counties have challenged here is how BLM will interpret terms of the settlement agreement when it actually adopts route designations and travel plans. BLM has not, as of yet, made any decisions about how it will designate particular routes or how it will account for wilderness characteristics or other resources of the public lands when it adopts certain travel management plans. The only commitments that it made in the settlement agreement are to adopt 13 new travel management plans and to do so under the procedures outlined in the settlement agreement itself. Those procedures do not require BLM to make any substantive decisions whatsoever. Now, help me out again here. So you're telling me that this settlement agreement does nothing more than involve travel management plans. The only components that the state and counties have challenged involve the travel management plan components. And so while the settlement does extend beyond the scope of travel management planning, the state and the counties do not challenge those other components. So I'm prepared to speak about those. But I don't think that they're an issue for this appeal. No, it's your time. Please proceed. This court needs to look no further than its Utah decision to find that this case is not right because there, as here, the state and county's challenges relate to how BLM will interpret or implement the process required by the settlement agreement. The settlement agreement requires BLM to consider some of the disputed components of the settlement agreement require BLM to consider potential route designations impacts on wilderness characteristics. The settlement itself does not require BLM to close any routes if those routes damage wilderness characteristics. And in fact, the settlement agreement leaves the existing travel management plans in place until BLM issues new travel management plans. Only when BLM adopts new travel management plans will it become clear whether or not BLM has implemented the settlement in an unlawful way. So for example, let's take this in the specific context of the guidance issue that my friends raised. If BLM implements a new travel plan and states we cannot follow new administration guidance because of paragraph 15 in the settlement agreement which made previous guidance binding, then the state would be able to challenge a new travel management plan and allege that that travel management plan had relied inappropriately on guidance that was elevated to the status of a rule and that should have undergone notice in common rulemaking. Until BLM actually makes a decision implementing a travel management plan, this court lacks the relevant facts to be able to discern whether the settlement agreement is lawful or not. And so finding that this case is or that the challenges raised by the state and the counties here are unripe, both preserves judicial resources because it doesn't waste this court's time in resolving abstract legal disputes about BLM's authority or what the settlement may or may not mean, and it also protects the state's interests because when BLM actually issues its travel plan, the state and the counties will be able to challenge them at that time and the issues will be focused, the factual record will be established, and the court will actually have something to review. Again, it's just out of curiosity, when the settlement plan was worked on and all of you were sitting around the large table, were the counties who are appellants here in the state, were they invited to participate? Indeed they were. And I would just like to add that the settlement agreement was reached under the auspices and with the assistance of this court's mediation office. All of the parties were involved and the fact that this settlement is fair and reasonable and lawful is reflected in the fact that we have numerous, not only diverse, but opposing interests who both signed on to the settlement agreement and did not oppose it. So for example, the State Trust Lands Administration did not oppose the agreement and participated in the negotiations. Two separately represented oil and gas industry groups also did not oppose the settlement agreement and we have the recreational vehicle user groups who agreed to sign the settlement agreement. There is a broad consensus reached on the terms of the settlement agreement and for the court to disturb it would mean that we would go back to litigating an enormous case, both in district court and on appeal. And given the lay of the land at the time that we decided to enter into these settlement negotiations, BLM had obtained a burdensome remedy order from the district court that would have required it to spend $3 million to comply with. We appealed that decision. We asked this court to stay the remedy order and evaluating the factors of whether it's appropriate to grant a stay pending appeal, including the likelihood of success in the merits, this court did not grant our stay. At that point, BLM was faced with the decision of how to proceed and given the uncertainties presented by litigation and the substantial resources that were at stake, we turned to this court's mediation office to help us see if we could resolve this case and this is where we have ended up. Well, one of the, back to the issue of whether or not we have an injury here, there is an argument by the state, by the appellants, that they will have to expend resources, employee work hours, et cetera, in order to be involved in the settlement process that's predicted. Those asserted injuries are not sufficient to support standing for two simple reasons. One, operating costs are not sufficient to demonstrate an injury that would allow standing to challenge any sort of federal action. And secondly, if there were some costs or resources that were to be expended that were beyond just normal operating costs, it is the state and county's burden to submit a declaration demonstrating what those are and they have not met that burden here. At no point have the state or the county submitted any such declaration with respect to their costs, not even beyond operating costs, but just what those operating costs would be. And unless the state and the counties can meet that burden, this Court could alternately sign that the state and counties do not have standing to challenge the settlement agreement. I would like to briefly address the suggestion by my friend that the settlement agreement creates substantive standards for managing wilderness characteristics. A review of the language and paragraphs... Well, before you go to that, I want to go back to the point of their argument that the agreement between SUA and the BLM gives SUA the authority to veto ultimately any decision that they might not approve in regards to the changes or the final recommendation of the final report that you might come out. It absolutely does not, and on that point... Well, I didn't expect any other answers than that, but I'm looking at the agreement. It does seem to imply that if they're dissatisfied, that they still could withhold their agreement. Now, whether that would hold up or not, but if they say we won't sign off, you're involved in another lawsuit, right? No, Your Honor, and the settling parties... There is no daylight between the settling parties' position on the meaning of paragraph 15, and let me be clear. Well, the settling parties, I don't expect it. I'm talking about what the state of Utah, and they're arguing that, in essence, the agreement, and I'm where Judge Briscoe was a while ago. When you look at it, it appears that they don't have that authority, but the authority does lie that they can refuse to sign off. And then where are you? You're arguing over whether or not they violated the settlement agreement. Well, the point about what the settling parties agree upon is important, because the settling parties include the environmental groups, and they agree that they don't have the authority to do that. You're a lawyer, and you know that at a point in time that you can agree that that's not what it says, but later on another lawyer says, no, that's what it exactly says. So even though you may be in agreement now, I'm saying that there can be at least the argument by the SUA that we're not going to approve that. We won't sign off. Respectfully, we disagree, and that's because of two sentences in paragraph 15, which expressly state that nothing in the settlement agreement makes binding the aforementioned guidance, and nothing in the settlement shall be construed as limiting BLM's discretion to promulgate new manuals. The last sentence at the end of paragraph 15 is best understood to refer to the fact that should BLM implement new guidance, the parties may agree to modify the settlement agreement to reflect that guidance. But that does not mean — it doesn't speak to whether or not BLM is allowed to follow its new guidance or not allowed to follow its new guidance. I would also refer the Court to paragraph 2, which explicitly reserves BLM's discretion to and authority under the — under relevant laws and regulations and states that nothing in the settlement agreement relieves BLM from complying with its obligations under those statutes. To provide the environmental groups with a veto would arguably violate the APA. I'd also like to point out, and it's important to note this, the district court doesn't actually have any enforcement authority over many of the — most of the terms of the settlement agreement. The district court only has enforcement authority over the deadlines in this agreement. So to the extent there were substantive disagreements about the application of the guidance, the court would have no authority over that. There's really no way for those components to — for the environmental groups to have a so-called veto power. Unless the Court has any other questions, I would like to — Thank you. May it please the Court. Robin Cooley for the Environmental Appellees. It is not every day that you have BLM, the environmental organizations, and three off-highway vehicle recreation groups sitting at the same council table. And I think that that is a real testament to the reasonableness of this settlement agreement. Well, counsel, let me go to the one point that keeps bothering me, and that is the argument that where you reserved the right to approve — and that's just paraphrasing what I saw in this settlement agreement. If you're agreeing that it has no effect, then why even have that in the contract to begin with? If you don't have some basis to oppose whatever the BLM is doing, then why even bother to put that in the contract? Because we want to be able to — Oppose. No, no, no. Not what I was going to say. We want to be able to modify the agreement. If BLM — let's say they come up with some new policy that they think is better than IM-2012-16 and it sets forth a procedure that makes more sense, then we want to have the ability to bring that into our settlement. So the language has meaning, but we are in complete agreement with the federal government that it does not mean that we have veto power over what the agency can and cannot do. And I think that — that the BLM, because of what may be transpired before on a possible right-of-way, has told the state of Utah that they can build a brand-new highway through some wilderness area. Travel management. And you say that's in violation of the agreement and we're not signing off on that. Do you have that authority? Because that's clearly contrary to what anybody would expect maybe the BLM to do, would be to provide a highway through a wilderness area or something like that. But I'm just testing the parameters of this agreement. Obviously, that's not something we're going to be happy with. But the settlement agreement doesn't, you know, say one way or the other whether BLM can authorize highways. So you're saying here in court that you would not have a veto power over that type of agreement that the BLM might have decided to use. Well, I think there are complicated questions about whether BLM has that authority. No, I'm not — let's assume that they do that. And you're very unhappy and you think that that violates the law or whatever your argument may be, and you refuse to sign off and approve that. Do you have that authority under the settlement? Not under Term 15 of this settlement agreement. Anywhere in that settlement agreement? Not in this settlement agreement. And I think that the debate that we're having over what BLM might do in the future, how it might affect its guidance documents, all of that points to why this case is not ripe. Because as this Court said in Utah v. Department of the Interior, when SUA was trying to challenge the wilderness settlement, which is an agreement reached between the State of Utah and the BLM, when there are these sorts of questions, the appropriate remedy is to allow the settlement agreement to play out on the ground, see how it impacts the parties, and then if the State and counties are impacted by those decisions, they can bring a challenge at that time. So we would urge this Court to follow that precedent and dismiss this case as unripe. Thank you. Thank you, Counsel. If you could add two minutes. May it please the Court. Sean Welch on behalf of Appellants San Juan and Kane Counties, Utah. We're joining with the other counties in the State of Utah. I do want to tie back to one point that Counsel just made. It's not every day that the United States and the environmental groups sit down in a room and make an agreement, and I think the context for that should be read by the candidate mission on page 8 of the United States brief. They couldn't comply with the remedy order. The District Court did not just send this planning action back for a do-over. The District Court ordered the United States to take discreet steps. The United States appealed the decisions made by the District Court the first time, sought relief and a stay of the remedy order at the District Court, sought relief at this court and was denied, and it's right there. They couldn't pay for what they were ordered to do. They didn't have the money, and so they went to mediation, of course. Well, you bring me right back to my initial question of rightness. It makes sense for us to be able, or for at least me to get my arms around this, to have more information about what possibly can happen under this agreement, but it hasn't been played out yet. And I don't know, well, back to the rightness question. Is it really, truly right for us to do anything to this argument at this time? Yes, Your Honor, it is, because, of course, they're trying to say wait until we get done with the process and see what the process kicks out. Well, final action, they're saying. Final agency action, yes. But consider that we did not, the state counties did not challenge the remand from the District Court to go comply with the NHPA, to comply with the regulations. What we've challenged is the extra add-ons that the environmental groups put on the BOM. And I can interpret paragraph 15 that's been discussed by this Court. The second-to-last sentence says we can adopt new policies. The last sentence of paragraph 15 says they won't apply in Utah for planning actions unless SUA agrees. Second-to-last sentence says they can adopt new policies. The last sentence of paragraph 15 says it won't apply in Utah. That's the thing that is really at the heart of the challenge by the state and the counties, is that the United States did something unique and special for Utah, just us. So on the merits, one of six resource management plans was found to be deficient under the NHPA and planning regulations. Look at the record. Wilderness was not there. Wilderness characteristics were not litigated. Then the BLM gets over the barrel. It's being ordered to do something it can't pay for. Goes to settle, runs to the environmental groups to say that they should settle. And, Your Honor, Judge Briscoe, you mentioned something about being in the same room where we invited. Had to threaten to get there into mediation, and to say that we were in the same room misstates what happened during mediation. I can't talk about. Were you invited to be a party to this settlement? We were asked to weigh in on it after it had been negotiated elsewhere, to comment on the sides. Certain provisions, but the draft was out. And please, I'm trying to be careful of the mediation rules that are there. But we had to threaten our way to even get invited to the proceedings. Well, I mean, it's not unusual in litigation when you have a situation where there is a court order or some event and the parties get together. And, you know, bartering occurs. There may not have been a wilderness characteristic claim in this, one of these many suits that were pending. But the fact that it was involved in the negotiation and made part of the settlement is not unusual. I understand, Your Honor, and I've represented clients in those situations. That's how it works. But this is the United States government. Is that how the United States government works? It gets into some situation where it gets held over a barrel and as it states candidly, we can't comply with the district court's remedy order. And suddenly a special interest group that has had one item coming back to this court time and time again has its day. I mean, there it is. And so now there's a different government regime from the BLM that is right now being, have to be complied with by the state and counties. The United States acts as if the state and county can choose whether to be cooperating agencies and participate. Utah is 66% federal land. The counties I represent are over 80% federal land. These resource management plans last for 20 to 30 years. They don't have the option of just sitting this one out and waiting to see what happens. They have to do it. And they're not complaining about complying with the regulations or FLTMA or the NHPA. They're not complaining about that travel, the new travel planning. It's the excess. It's the wilderness characteristics. Find that in the statute. Find that in a regulation. It's not there. It's in the settlement agreement. Okay. Thank you. Thank you, Your Honor. Thank you all for your arguments this morning. The case is submitted. We'll take a 10-minute break at this time. When we return, we'll hear arguments in southern Utah.